**Case No. 25-1224**

———————————————————————

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————————————

JOSEPH CRUSSIAH

Plaintiff-Appellant

v.

UNITED PARCEL SERVICE,

Defendant-Appellee,

MARC ELRICH,

Defendant-Appellee.

———————————————————————

On Appeal from the United States District Court
for the District of Massachusetts

District Court Case No. 24cv12398-RGS

———————————————————————

BRIEF OF APPELANT-PLAINTIFF

April 30, 2025

# **TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................i

TABLE OF  CASES,, STATUTES, AND OTHER AUTHORITIES.........ii

JURISDICTIONAL STATEMENT........................................................... 1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE....................................................................3

SUMMARY OF THE ARGUMENT...........................................................5

ARGUMENT...............................................................................................5

   A.  STANDARD OF REVIEW...............................................................5

   B.  APPELLANT DID PLEAD SUFFICIENT FACTS, AND ALONG WITH
       REASONABLE INFERNCES; TO SURVIVE MOTIONS TO DISMISS
       FOR FAILURE TO STATE A CLAIM BY APPELLEE UPS, AND  FOR
       LACK OF PERSONAL JURISDICTION
       OVER APPELLEE ELRICH................................................................6

CONCLUSION..........................................................................................22

SIGNATURE.............................................................................................23

CERTIFICATE OF COMPLIANCE.........................................................23

ADDENDUM............................................................................................ 24

## TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

*Crussiah v. Inova Health Sys*, 2015 WL 7294368 (D. Md. Nov. 19, 2015)

*Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017)

*SEC v. Tambone,* 597 F.3d 436, 438 (1st Cir. 2010) (en banc)

## JURISDICTIONAL STATEMENT

Appellant timely appealed the Memorandum Opinion and Order of the District Court for the District of Massachusetts which granted a motion to dismiss in favor of Appellee United Parcel Service, on all of Appellant's claims, and which granted a motion to dismiss in favor of Appellee Marc Elrich, on all of Appellant's claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final order of the District Court.

## STATEMENT OF THE ISSUES

### First Issue Presented for Appeal

Whether the District Court erred in granting Defendant United Parcel Service's Fed.R.Civ.P. 12(b)(6) Motion to Dismiss Plaintiff's Private right of action TVPRA claim against UPS.

### Second Issue Presented for Appeal

Whether the District Court erred in finding that it lacks personal jurisdiction over Defendant Marc Elrich.

All three parties are foreign to Massachusetts. The District Court never recognized this fact about Plaintiff Crussiah, and Defendant UPS; while making it the entire focus as it pertains to Defendant Elrich. What it takes to create jurisdiction is tortious, or other unlawful conduct on the part of each of the two Defendants, and that which relates to MA. The District Court dismissed claims against Elrich on the basis of lack of personal jurisdiction, alone. It dismissed the claim against UPS for failure to state a claim, alone.

This case was initially assigned to another U.S. District judge, who recused herself. It's reasonable to assert that if the case, on it's face lacked facts, and could be dismissed, and the ruling upheld by the Appeals Court, reviewing de novo, why the question of, perhaps, conflict of interest, arises. Impartiality issues, it would seem, would be of significance at the discovery, and trial stages, where appelate review is deferential.

Counsel for Elrich, at the District Court, and who entered her appearance at the Appeals Court, has been granted her motion to withdraw.

During the time the case was at the District Court, Plaintiff had been in contact with other counsel for UPS, who is with the same law firm, as the noticed counsel for UPS, but practicing at their Philadelphia offices. There is proposed settlement documents from UPS, that Plaintiff doesn't see as being inadmissible under any

rule.  Furthermore, the burden falls upon UPS to raise an objection.  UPS has not done so, both in court filings, nor contacting Plaintiff to assert a privilege theory. The proposal (Addendum 003) includes non-disclosure, and non-disparagement.  A fair interpretation of the language used by UPS, is that UPS admits to the entirety of the allegations in the Complaint.  UPS with specificity, singles out Massachusetts, and concurs with The Complaint that UPS is liable for misdeeds that allow claims within Massachusetts.  Additionally, that there is related misdeeds, beyond what the Complaint alleges; by UPS, and by others acting with UPS, both in Massachusetts, and elsewhere.

The same District Judge appears to have a history of dismissing private TVPRA claims, before discovery is allowed to occur.  The Court of Appeals vacated such a dismissal in *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017). This Appeals Court, and the Plaintiff in that case, is vindicated, seeing that the defendants in that case, it appears, made a monetary settlement, rather than risk misdeeds coming to light.

In the instant case, the District Court entirely ignored the existence of, and findings from a 2015 related case *Crussiah v. Inova Health Sys*, 2015 WL 7294368 (D. Md. Nov. 19, 2015), in The U.S. District Court of Maryland, that were in the Complaint, and six relevant pages that were submitted as exhibits.  Similarly, for another leg of the case, The District

4

Court, though it did acknowledge a set of unsolicited emails that were alleged in The Complaint; it entirely ignored what was being messaged in a thinly-veiled style. The thinly-veiled messages do allow the reader to identify specific misdeeds, and to narrow down the identity of the wrongdoers, to include Elrich, along with unknown past, and present executive level employees of UPS.

**SUMMARY OF THE ARGUMENT**

The District Court's memorandums are fully contrary to the contents of The Complaint. Nearly the entirety of The Complaint and exhibits show no signs of having been considered. The scintilla of what's purported to be allegations from The Complaint includes statements that cannot be found in the entire Complaint, let alone at the paragraph cited. The District Court erred in how it evaluated strong circumstantial evidence, giving the evidence no consideration at all; leading it to err in ruling to dismiss all claims, against all Defendants. Both issues on appeal are argued together, as the allegations are that both Appellees are in a joint venture, and are liable for the other's conduct.

**ARGUMENT**

**A.    STANDARD OF REVIEW**

A Motion to Dismiss for failure to state a claim, and a motion to dismiss for lack of personal jurisdiction are reviewed de novo.

"Because this appeal follows a dismissal for failure to state a claim, we draw the facts from the complaint and those documents fairly incorporated into it. *SEC v. Tambone,* 597 F.3d 436, 438 (1st Cir. 2010) (en banc).

**B.**    **APPELLANT DID PLEAD SUFFICIENT FACTS, AND ALONG WITH REASONABLE INFERNCES; TO SURVIVE MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM BY APPELLEE UPS, AND  FOR LACK OF PERSONAL JURISDICTION OVER APPELLEE ELRICH**

The District Court took erroneous steps in evaluating, and fitting the multiple data points, into a whole.  The approach could be said to be akin to not turning a car on, and then asserting that the steering wheel doesn't work.  The District Court has created a myriad of catch-22 standards leading to erroneously not considering nearly the entire Complaint, as the Complaint is supported mostly by strong circumstantial evidence.

The first reasonable step is to examine for congruence between the findings of the Maryland District Court in November, 2015; and the revealing emails sent to Plaintiff that were linked to UPS Store addresses in Massachusetts.  The emails, albeit in thinly-veiled fashion, were demonstrated by The Complaint; to taunt Plaintiff that a criminal venture within the meaning of TVPRA violations, and Section 1983 violations, among others, that is ongoing today; is the cause of the harm to Plaintiff that was found by the 2015 ruling.  The emails go on to give the

motive for the harm, along with informing about other harm that was caused, that would have not have been known to Plaintiff in 2015. The thinly-veiled emails can reasonably, and somewhat readily be deciphered to show that both Appellees, are a major force in meting out the harm.

It's within the email text, imagery, specific times at which they were sent, and the creative vanity plate-like domain registrations; where the strongest available evidence tying the harm to both Appellees, exists. The District Court is requiring that The Complaint first prove that Appellees have a role in the UPS address rentals, that were used to purchase domain registrations to send the emails, before that court will be inclined to consider facts that can be derived from the emails.

The District Court memorandums never acknowledged from The Complaint that The U.S. District Court of Maryland, in a related case, made findings, and what the findings were. It appears that the District Court in the instant case will not consider the findings from the other court of 2015, because the linkage to Appellees is in the emails, and the District Court refuses to consider those emails.

The findings were that, owed to malfeasance, Plaintiff's brain, and other body systems were injured, and he was made unconscious for a one hour period, perhaps owed to the brain being deprived of oxygen. The motive, and the precise technique were uncertain. That court additionally found that what followed, and was ongoing at the time of the November, 2015 ruling; was that physicians, and

other medical professionals engaged in a scheme, including resorting to improperly using police; to conceal facts, and to obstruct Plaintiff from receiving any meaningful treatment. This, in-turn results in ongoing exacerbation of the injuries, where they otherwise could have been minimized.

The District Court states that "personal mailboxes" rented by UPS Store franchisees who are to be seen as third parties, in turn to other third parties, were used to send taunts to Plaintiff. The Complaint, in contrast, had stated and demonstrated that the service being misused is not the physical mailboxes, but the "fake addresses" suite numbers, that accompanies it. Furthermore, everything else The Complaint stated about the taunts from these fake addresses were not considered by The District Court.

The Complaint had demonstrated, yet missed by The District Court, that UPS directs the operations of the mailbox "fake address" unit. That UPS has safeguards, including UPS vetting rental applicants. That the reasonable inference from the circumstances is that UPS executives micromanaged, and strong-armed it's employees, and franchisees into ignoring "redflags" that presented.

The Complaint did not advance a negligence theory, and respondeat superior theory against either the higher-ups at UPS, nor with Defendant Elrich with his role as the head of Montgomery County Government. To the contrary; The Complaint alleged that all Defendants, for their own depraved sexual motive,

directed the acts, and omissions of their subordinates.

The District Court never acknowledged the nature of the sexual allegations, other than to mention the word, sadomasochistic. The Complaint, in contrast, made clear, that without much effort, what can be derived from the communications, and matched with the observed circumstances beginning from the afternoon to the MRI scan, February 15, 2013, and persisting into the present. That Defendant Elrich, and unknown past or present UPS executive level employees (and this could be substituted with unknown executive level employees of one or more of it's large clients, for who, executive level employees of UPS are aiding and abetting); gain sexual gratification from the dominatrix genre, and crosses the line from mere fantasy, or that directed at themselves; to criminal, and directed at others, notably, Plaintiff. They are aroused by situations of females abusing and dominating males. This could be sexual, physical, emotional. Other forms, previously relegated as obscure fetishes within; have become popular in recent years. This could be a scenario where the males are commanded to turn over their wealth to the females. This could be a scenario where the male is ordered to engage in criminal activity. The criminal activity could be financial as misappropriating funds, and it could be violent acts. There is other criminal activity as arousal from viewing females abusing animals, or arousal from viewing females engage in large scale destructive acts as arson.

These dominatrix themed fantasies carried out would miss the mark if the men were ordering up the females to perform specific acts. The Complaint states and demonstrates that these men have the females running the show. The Complaint uses the term females, and not women, because of indications that not all the females are adults. The men, eagerly, facilitate the plots of the, otherwise powerless, and somewhat on the intellectually dull natured, females. The Complaint always made clear that it's not Elrich, and executive level men from UPS coming up such ideas as a multimillion dollar taunting email campaign.

One of the registered domain names is "obsessionhedge". The word obsession in American culture is primarily used along the lines of sexualized situations. The word hedge, in recent decades, is most often used with the financial instrument, the hedge fund, an arbitrage type investment strategy of win-win.

The emails, along with new medical facts, do unravel the three primary unknowns, noticed by the November, 2015 court ruling. That of motive and means involved during the day of the MRI test. Additionally, the motive for obstructing treating the injuries, which when healed would have been beneficial to cover up the criminal acts during the MRI appointment.

The means was of using the tools of catherization procedures, and to deliver water into the brain. The expectation was that of permanent long-term brain injury, such that would permit a continuation of the forced sexual acts, at a facility

like a nursing home. The District Court memorandums quoted virtually nothing from The Complaint. The sole quote for which the District Court cites a paragraph number, paragraph 3, of Plaintiff alleging that he was drugged, doesn't appear anywhere in the Complaint. The word, drugged, appears in paragraph 9, but the it was pointing out that he was not drugged.

The obstruction of medical treatment does aid in pushing Plaintiff's medical status back toward what it could be said, he escaped from. Additionally, within the context of BDSM or sadomasochism; inflicting suffering produces sexual arousal. These hedge type, and multiple motive conduct is a modus operandi that's seen in many of the misdeeds of this joint venture.

The Complaint shows that Montgomery County Government engaged in misdeeds, and harm, both acts, and omissions, to Plaintiff, and his neighborhood via multiple departments. Reason does not dictate that multiple departments, layers,and a hierarchy of employees, and agents were independently engaging in this conduct. Reason dictates that it all points to the individual at the top, Elrich.

The abuse of Plaintiff's neighborhood has, as the modus operandi goes, multiple motives. The abuse would fit into a BDSM thought stream. It is useful as a tool of harassment, to intimidate, and to distract Plaintiff from the work at hand for him. There is a temporal link to some disasters, and other tragedies, often involving victims who are highly accomplished females. That, these acts, often

ruled accident, for lack of other a better explanation; are actually ordered up by envious, and jealous lowly females who appear to be involved in the misdeeds against Plaintiff.

The District Court does not give the motive for these tragedies that Plaintiff asserts. Furthermore, the District Court states that these events are a mainstay of The Complaint. The Complaint, however, states that Plaintiff has placed this issue to give full context, and to allow harmed nonparties to join in Plaintiff's suit, or to take up their own. That Plaintiff intends to focus on acts, and omissions, directly done to him, and his house, yard, neighborhood, all where he becomes an indispensable fact witness.

## RELEVANT SECTIONS OF THE COMPLAINT

3. Defendants, and others they participate with, **along with other tortious conduct**; spent $2 Million to purchase 3000 or more internet domain names, and linked them to Boston Area UPS Store addresses. Then waged an abusive email campaign; time-wise, equal to full-time employment for 20 individuals. More than 50,000 thinly-veiled taunting and threatening emails. **Many of the emails display Boston Area UPS addresses within the message. A celebratory effort by UPS and persons in Massachusetts, to alert Plaintiff to their participation**. The fact that these emails were programmed to auto-delete the body, months later; further demonstrates the malicious nature. Sufficient copies of the emails were saved by other means as printing, and screenshots. The messaging wasn't limited to the email body. The 3000, individually crafted, domain addresses include such names as vr6k.com (**We are sick**), **bigwigfest**.com, **obsessionhedge**.com, **veeflaunt**.com, and iambtoyer.com (**I am boy toyer**).

9. **The Boston emails campaign perfectly match, explain, predict; the continuous tortious acts, felt and noticeable to Plaintiff since February 15, 2013; and tell as follows**:

a. Executive level individuals from large corporations, institutions as hospitals and universities and local, state and federal governments, including Elrich and UPS executives; operate and/or participate in a sadomasochistic sex crime venture, having a myriad of themes. Objectives are accomplished by abusing the resources and powers of their organizations. Defendants' interest runs along a dominatrix-type theme. This division is based in the Boston Area, primarily Cambridge.

b. Defendants and others were successful in carrying out a scheme; powered by, and

12

and including a large number of persons from Healthcare.  The pretext of a MRI test that

allowed for injection access; made it possible to unlawfully make Plaintiff unconscious.  Then, subject to sexual assault by females, with men viewing for sexual gratification.  Additional participants engaged remotely, primarily from Massachusetts and Wisconsin.

     c.    Drugging via the vein is what would be expected to facilitate an assault limited in time to the afternoon of February, 15, 2013.  Instead, something else occurred: The injection into a vein; was secretly substituted with placement of a catheter and tubing into an artery, advanced via the artery system, up the arm, across the upper chest, to the neck.  Violent actions, that caused
bleeding and pain in the hand, destruction of the ulnar artery, such that a pulse can never again be felt, injuries to the artery system including an aneurysm to the aorta.  Water was, then, sent into the brain.  This caused loss of consciousness.  Water put into the brain, causes a permanent injury, something similar to the most severe stroke.

     d.    Permanent incapacitation, equal to a massive stroke, such that would permit the conduct to continue in a nursing home type facility; was attempted.  Defendants and the others, did things like; obtain childhood photos of Plaintiff for when he was 7 years old, from another country at that.  Some photos they sent to Plaintiff, he's seeing for the first time.  The mindset isn't about gratification from assaulting Plaintiff, who was 42 years old in 2013, and then continue into his 50's.  It's about a sadomasochistic fantasy script, where the perpetrators do get sexual gratification in harming Plaintiff with permanent injury, and incapacitation.  From that point, forward; it doesn't appear that further physical violence against Plaintiff was sought.  It becomes all about how sexual assault of a vulnerable adult or young child is perpetrated.  Defendants, and the Venture want to come close as possible to making Plaintiff about 5 of age, and keeping him that way permanently.

     e.    Defendants and their venture partners failed in accomplishing permanent incapacitation on February 15, 2013.  Undeterred, they embarked upon continuous tortious conduct, even gave it a name "**Obsession Hedge." C**onduct with 2 objectives, with individual actions furthering, one or both objectives  One; to bring about permanent incapacitation.  Two; sadomasochistic conduct during the wait, that temporarily substitutes for the original script.

     f.    Plaintiff had treatable injuries.  Defendants and the Venture; obstructed Plaintiff's monetary opportunities, as employment, and Social Security Disability.  They obstructed his medical care.  The severe stroke-like condition could materialize.  Mainly what occurred is that the injuries progressed along a different path; that of increasing injuries to vital organs as the heart and lungs, aneurysm of the aorta, and functions as vision, speech, muscle weakening, severe dehydration, and changes in physical appearance bordering on disfigurement.

     g.    There are 2 distinct demographic cohorts for this group.  The men hold powerful positions, as being at the top levels of entities as Boeing, and PGE, the California utility, and positioned similar to Defendants.  The other grouping is the females.  They are nobodies; and as the emails claim, some are under 18.  The men desire the females to command out tasks for the men to fulfill.  One of the objectives of these tasks; is for these men to be so submissive to these females, that they engage in conduct, damaging to themselves, and the organizations they lead.

     h.    The tasks include the tortious conduct that causes suffering to Plaintiff; from the bodily injuries, and from financial ruin.  Conduct that promotes both of the 2 objectives; bringing about permanent incapacitation, and ongoing sadistic pleasure.  Other sadistic conduct during the holding pattern, are acts mimicking terrorism, targeting The Public, while taunting

Plaintiff that these acts are related to him.  These acts represent the most popular dominatrix type themes.  Concepts as Giantess, and Crush-fetish, for which, a website as PornHub, features simulations of giant women in Godzilla destroying cities type events.  Other concepts as harming animals, men wanting to be small children and obsessions with mother, older sisters, and so on.  A regular pattern was: trees removed without cause, in Plaintiff's neighborhood by MC Govt, coinciding with disasters labeled accidents.  These include the software issues leading to the crashes of 2 Boeing 737 Max, and the missing Malaysian larger aircraft.  These include wildfires for which PGE, eagerly accepts blame, under the implausible vegetation overgrowth negligence theory.

      i.    Wisconsin and Massachusetts are the states most represented in the emails, much more so than Maryland.  One of Plaintiff's sister's shares a July 10 birthday with his mother.  On that day in 2018; gas explosions near Madison, WI killed 2 firefighters.  The Merrimack Valley gas explosions with at least one death, in 2018, occurred on Plaintiff's birthday.  Columbia Gas responded with the response seen with these other events, but not seen prior to 2013.  That of admitting to gross incompetence; **false negligence mea culpa to cover for depraved conduct**.

      j.    Over 10 years, apart from a few blips; this Venture had great success in restraining Plaintiff.  A **period of relative success for Plaintiff was May-July,** 2014, this is what **triggered the Venture to embark upon the UPS mailboxes and email campaign**. This Venture is greatly weighted to one industry; Healthcare.  The Venture manipulated the psychiatric care of teenager Michelle Carter at McLean Psychiatric Hospital in Belmont, MA.  There was 18 months of messaging between her and Conrad Roy prior to the her hospitalization.  It was only after, and immediately after release from McLean, that she pressured him into suicide.  The first attempt about 2 days preceding July 10, 2014.  The successful attempt about 2 days after this date.

      k.    As far as the instant case; **Plaintiff has no interest in relitigating criminal cases, and events as disasters, misidentified as accidents.**  The odds would've been, that the next similar event to the Michelle Carter case, of females being responsible for evil, deadly, acts would be in a state, other than MA.  The next 3 cases, were yet again in MA.  Alexander Urtula was pressured, by his girlfriend to commit suicide from a 9 story Northeastern University parking garage in 2019.  Later in 2019, a murder-suicide, Erin Pascale, and her 2 small children.  Pascale, like Urtula belonged to the Biotech Industry, thus a Healthcare link, appears.  The 9th floor could be a play on Plaintiff's September birth month.  During the same period in Maryland; a toddler fell out of a 9th floor apartment at the closest high rise to Plaintiff's home, a woman sought by police was said to have committed suicide from the 9th floor of the building where Plaintiff's father lives, a 3 alarm fire started on the 9th floor of the building where Plaintiff's sister owns

rental property.  The criminal conduct occurring during the MRI test on February 15, 2013 wasn't spontaneous.  It may be gleaned from events in the Summer of 2012, that the venture against Plaintiff began at that time.  What's solid, is that, the physician who wrote the order for the MRI test, and directing Plaintiff to one specific facility; was part of the venture.  The date of the MRI script was January 24, 2013.  Then, precisely 10 years to that date, on January 24, 2023 is when Lindsay Clancy, a nurse with Mass General is said to have murdered her 3 young children, and attempted suicide that resulted in massive injuries to herself.

      L.    The Obsession Hedge period that began immediately after February 15, 2013 is viewed by the Venture as labor and servitude from Plaintiff.

**IV:  Medical Facts, and Tortious Interference substantiated by 2015 court ruling**

10.     The construction of the instant case is of having it's legs, revolve around the de facto admission, that is the email campaign.  As to limit size, the Complaint tries to be as minimilist as possible with each leg.  One of legs of this case is hundreds of pages of medical evidence, medical opinions, and  transcripts of lawfully recorded conversations; substantiated by a 26 page ruling by the U.S. District Court of Maryland, in 2015.  (Joseph Crussiah v. Inova Health System) Exhibit B consists of 6 relevant pages from the ruling.  It shows two sets of odd events, both related:  First, an event presumed to be medical malpractice, but unusual for medical malpractice.  Massive internal injuries, and a one hour period of unconsciousness; caused during a MRI scan test, known to be harmless.  Second; tortious conduct, presumed to be a coverup over malpractice, but odd, in that, the scheme worked to exacerbate injuries, that could have easily been treated and erased.  The scheme cost far more than a potential award from malpractice action.  The scheme appeared to, unneededly, create liability for others not tied to the original event.  Unknown at the time; such tortious conduct was parts of **Defendants' "Obsessionhedge"**.

11.     **That Court**, in November, 2015, using words Plaintiff never used, as **malfeasance** and **misdeeds**; **took notice of malicious and criminal conduct**.  The Court found; brain deprived of oxygen, unconscious for 60 minutes, by perhaps, using a massive quantity of Gadolinium, the contrast agent.  Since 2015; some of the medical theories have changed.  It was water, directly into the brain, and not a misuse of the image contrast agent.  The data recording created by the MRI machine showed a 66 minute period of no events for the machine. Dr. Jacobson wrote the interpretation; fraudulently claiming to be Radiologist John Athas, MD of New York.  Water into the brain results in pituitary gland injury, and hydrocephalus.  Report falsely claimed that the script for a standard MRI of the brain, was instead for a "Pituitary Protocol."  This allowed him to highlight the fact that the pituitary gland was normal.  He added "no sign of hydrocephalus" not something that's normally commented on, with either version of the MRI.  (Evidence for this paragraph is in Motion for Preliminary Injunctive Relief)

12.     The Court found the technician to be acting suspiciously, and Plaintiff was never told about anything out of the ordinary occurring.  The Court found that when Plaintiff went for a follow up, weeks later, with Dr. Sonalee Kulkarni of the Inova neurology practice, and informed her about odd behavior by the MRI tech and new symptoms; she reacted is a way, including great nervousness, that one could conclude she was knowing about the criminal acts.  Dr. Kulkarni wrote "canceled" for the order for the MRI, in the medical records.  The test results couldn't be found in Plaintiff's medical records by a nurse, and other staff.  Dr. Kulkarni was able to produce it, from where she stored it; hidden in her private computer files.

13.     **The Court found collusion between medical providers of that time, with those in the future;** to hide facts, and **to deliberately not provide treatment.  The Court found that this unlawful scheme was being enforced by police, when needed.**

14.     The Court took notice of a **statement by a nurse at the Inova Neurology practice**; that **meetings were held** that included officials and doctors from Inova, along with **others the nurse wasn't familiar with.**  It's reasonable to conclude that the "others" over and above what would've been expected for a malpractice type event; show that something other than medical malpractice is involved.  That, "others" included Defendants, and persons from Massachusetts.

15.     The Court found that on December 17, 2013; Plaintiff went to his doctor's office to

obtain medical records.  Further finding that prior to printing, the receptionist, a middle age woman; inspected the first page.  She read the first few words out loud.  It was a defamatory statement about Plaintiff.  She read the remainder, silently, in visible astonishment, and departed her post.  Perhaps 30 minutes later; Inova management accompanied by Fairfax County Police, arrived.  Plaintiff was given the records, after the first page was removed, and the subsequent pages having page numbers whited out.  Inova complied with Plaintiff's subsequent request for records without whiteout, but still did not release the first page.

16.     Hindsight, and much of it derived from the Massachusetts UPS linked emails; dictates that the statement placed at the front of the records, came about following Plaintiff's complaint to the Virginia Board of Health Professions.  That, though Plaintiff wasn't thinking along the lines of sexual assault, nor made any such allegation to that government agency; this venture conspiracy that includes Defendants, via the respondent physician, responded to that medical board, in 2013; corroborating the theory Plaintiff today alleges.  The difference being that; no one associated with Inova is involved, and that Plaintiff was in a consensual pact with unknown individuals to incapacitate, injure, and commit sexual assault against him.

### V:  The Emails: the following is a sampling, not an exhaustive listing

17.     Plaintiff respectfully requests the honorable Court to interpret these communications

(Exhibits A1-A34) in the same way This Court or U.S. Marshals would do for cryptic communications that are evaluated for threats against This Court. The emails communicate the key points of the preceding narrative, including: a dominatrix type sexual theme, involvement of powerful and connected people, bodily injuries and suffering to Plaintiff, and the view of the Venture that however the tortious conduct impacts Plaintiff, it's merely, owed labor and servitude.

18.     **Email messages** bearing **Massachusetts UPS Store addresses** were **coordinated with unlawful conduct of Montgomery County** directed at Plaintiff.  Reasonably, when multiple MC Govt agencies are involved in these actions, such widespread conduct couldn't occur without being directed by Defendant Elrich.  **As the Montgomery County Government conduct occurred, it was in real time; that the emails were sent, bearing UPS Boston Area addresses, and which knew specifics, as if it were Elrich himself sending the emails**.

19.     Every part of the malicious email campaign sends a message.  Job search and placement, fly by night businesses; have long garnered scrutiny from the Postal Inspector's Office, and state AGs.  The Venture, nonetheless, created this type of appearance; because of their need to inform, and instruct Plaintiff, that a heavy load of labor is being forced on him:

Exhibit A1:  Sent by domain address iambtoyer.com intended to be read as "I am boy toyer". Responsibility for the message is claimed by Wage Wonder at 15 Main St. Watertown, MA, a UPS Store.  Subject says "this joke will make you laugh" and "comic relief", but the partial purported joke that is given presents something dark.  A title of "Dead again".  Something about a faint moan coming from a woman in a casket.  The initial incapacitation on February 15, 2013 is the "dead." The incapacitation failed to become permanent.  From that time, forward; Plaintiff is severely injured, and Plaintiff is struggling to get help, and on the way to incapacitation, again.

Exhibit A2:  The domain address for Wage Wonder is wagewonder.com, address given to the domain registry is 27 Norwood St. Everett, MA; another UPS Store.  Registration date is in 2014, one of the initial purchases of domain names.  A trickle of UPS mailbox, and other

mailbox addresses as P.O. boxes from other states began to be used around 2017.  The bulk of the domain registrations were created in 2014-2017.  All of those, use Boston Area UPS Store addresses.  Domain registrations require renewals; and this was done.

Exhibit A3:  Reverse Whois shows 49 domain names, registered to Wage Wonder, with domain names as veeflaunt.com, to be read as "we flaunt" and underdressesapocalyptically.com. "Underdresses" can only be taken as sexual innuendo  "Apocalypse" refers to the violent end of something, perhaps Plaintiff's life.  One called "affixunderclothes." Medical terms as "chemoreceptors" related to the brain and pituitary gland, tachycardia related to severely elevated heart rate.  Term "unlawfully" appears.  Other words as "wadisconcurrently" are cryptic to a level that no one outside the Venture would know what it means.

Exhibits A4-12:  Many more job search themed domain names as job-jackal, job-cheetah, along with a site called gigagaggle.com.  These domains with the Massachusetts UPS Store addresses were used as the contact for purchasing additional domain addresses.  Each, by using the same contact info, is linked to 50 of more domain addresses, some as mahalomedia.com with 300.  UPS Store addresses, including: 60 Thoreau Street #246 Concord, MA; 15 Lincoln Street Suite 240 Wakefield, MA; 102 Great Bedford Road Bedford, MA.  All this is merely a sampling. There really are more than 3000 domain registrations.  As the sampling reveals; the domain registrations began in June, 2014.  The first half of 2014, was when Plaintiff had obtained nearly all medical related evidence he possesses.  This seems to be what triggered the email campaign. The domain registrations from 2014, and 2015 are entirely employment themed.  2016 is when

the Venture became so bold as to begin to buy domain addresses using the innuendo of the criminal activity, as often occurs in ventures of child sexual abuse, and pornography.

Exhibit A13:  In November, 2017 Plaintiff sent certified mail, within 20 miles of his Maryland home.  USPS deliberately botched the delivery, and it took a month to complete.  At the same time, a email was sent to Plaintiff tied to UPS Store 955 Massachusetts Ave #219 Cambridge, MA; with a "fact of the day" about the salary of the Postmaster General, as a way of taunting and taking responsibility for corrupting USPS.

Exhibits A14-21 :  A series called; Word of The Day.  Mavourneen, an Irish word that means darling; The link is for Dictionary.com and usage of word shows "Ah Mavourneen, Mavourneen, you'll never come back to be alive again".  "mavourneen, you must save me quick or worse will happen yet".  Hydra, a reference to water that was sent into the brain.  Hedonism, a reference to the group sexual conduct.  Immure, to make walls around or put in a dungeon. Titivate, sexual promotion and arousal.  Zugzwang, being trapped and any move comes only with loss, not even an English word.  Shivoo, boisterous party or celebration.  Plutocracy, a reference of a small group of perhaps corporations and government officials having absolute power.
Some of the other words include: Venial, a sense by these perpetrators that these crimes should be excusable; Encephalon,  a reference to the brain; Pulverulent, something that is pulverized.

Exhibit A22: An email showing the Watertown, MA UPS Store address.  There is an image of a decorated egg, along with the words: "Amazon, will you be the next winner, Crack the egg". The word Amazon, derived from the mythical tribe of large powerful women comes up often in dominatrix themed fetishes.  The egg refers to Plaintiff's head.  As the medical and other facts reveal; injuries were caused to Plaintiff's brain, that allowed for sex assault to occur subsequent to incapacitation.  **The phrase "next winner" is easily interpreted as future crimes, with new participants; directed at Plaintiff, that repeat the events of 2013**.  In recent years, "easter

eggs" has it's definition expanded, and the term is used a synonym to "clues". And the emails are of a cryptic nature.

Exhibit A23:  The riddle says "I am useless when together but useful when I am broken apart.  What am I?  I am an egg".  The egg would be taken to mean Plaintiff's brain, therefore; Plaintiff's brain is useless to the venture, unless it's injured by force.

Exhibit A24:  The riddle talks about 32 White horses stomping.  This can be taken as 32 white women engaged in the crush-fetish.

Exhibit A25:  The riddle says a man is hanging from a ceiling with none of the usual implements needed for such a death.  All that was there was a puddle of water.  He stood on an ice cube to hang himself, which was slow and painful.  Here again, **extremely violent and torture like situations are presented as light hearted jokes and riddles**.  Other riddles include;
"You are trapped in a small room with the lights off. How do you get out"? "A man is found dead in a telephone booth.  His arms are bloody, and the windows on either side are smashed out. Gestured with his arms, while talking, and bled to death from the cuts".  "A body is found at the base  of a thirteen story building".  "Brain teaser" and "stump" could have a harmless meaning when tied to riddles.  Coming from Defendants, and their venture;; "brain" could mean injury to the brain by force, "teaser" could mean taunting, and "stump" could relate to removing trees.

Exhibit 26:  Says "Bible Verse of the day". It's a verse with no context and the verse itself isn't of it's entirety.  The selective part that's shown is "Likewise ye younger, submit yourselves unto the elder".  The quote "Let ye without sin, cast the first stone", along with the word of the day "venial" were emailed Plaintiff at about the same time.  The subject box is entered in such a way that it's personally directed at Plaintiff, "Joseph, God's wisdom for you."  The from box says

"Prayer per day." A verse per day was never sent from the service that purports to email out Bible verses.  All that was sent is what is mentioned here.  The words match with that of the men in this Venture, as Elrich, being older to Plaintiff.  The females are younger than Plaintiff, but there the mindset is of causing brain injury to Plaintiff, whereby his functional age is that of a young child.
The quote about sin and casting the first stone references prostitution, and adultery; death penalty violations of that time and place for sexual offenses.  The facts of the instant case do feature older well-connected men, combining with young females for egrecious sexual violations.

Exhibit A27:  What is said to be a riddle, is a well known legitimate technique to challenge sexist prejudices.  That people would never consider that a surgeon would be a woman.  Viewing from the context of this series of emails, shows again a scenario of bodily injuries; here, from a bicycle accident for which ambulances and surgeries are needed.  A second point is that similar prejudices prevent one's mind from considering females to be involved in depraved crimes.

Exhibit A28:  Few days after Las Vegas Mass Shooting where nearly all the dead were couples; Gigagaggle from Massachusetts sends a cheerful "time to let your hair down, and take a trip with your better half" fake ad promoting Las Vegas vacations for couples.

Exhibits A29-30:  Some of these pictures don't have clear images; Plaintiff does have the original saved images, which are very clear.  The people sending these emails, without permission, lift and link to legitimate businesses.  The same ad is sent using two different email addresses linked to UPS Stores in Massachusetts; veeflaunt.com to be read, "we flaunt" and iambtoyer to be read, "I am boy toyer".  The image, by doing a Google Image Search shows a

stock imaged titled "confident young woman".  The creators of the stock image don't promote any obscene meaning; but those who sent it to Plaintiff, do.  One hand of this woman is resting in her crotch, and the other is holding a paint brush.  One strokes with a paint brush, and strokes in a

term that used for a hand job with male genitalia.  Then notice how the ad was created for a credit card company in Beaverton, OR.  Beaver is well known slang for female genitalia.

    <u>Exhibit A31</u>:  A domain address called giantfairies.com, a reference to the giant White females.  An unauthorized ad for a well known business, Lull Mattress, with language the company would never use.  Phrase "3 Ways, You can get screwed" with "You can get screwed" in red, in the color version.  Screw is the equivalent of the F word.

    <u>Exhibit A32-34</u>:  The Venture engaged in a campaign of abuse against Plaintiff's neighborhood.  Removal of all the trees was one of the things being done.  Additionally, tree removals would be expected to increase heat, and thus exacerbate the cardiovascular, and pituitary gland injuries, the venture caused to Plaintiff.

A33 shows holes drilled into roots at private property of Plaintiff's residence.  A34 shows MC Govt removing the last tree it maintains around Plaintiff's house.  Plaintiff's 80 year old neighbor went to talk the crews out of removing the tree.  This was met by police response.

    Within minutes of the tree being removed, and lasting for 2 weeks; there was a huge surge in the volume of emails.  Emails as A32 saying: It's already too hot in your house.  It's possible that "slow cooker" could be meant to mean the harm to Plaintiff's body by the increased heat.  Emails prominently featuring the address of the UPS Store in Braintree, MA.  In 2020, the domain address reading "No trees, just sand" was purchased, and linked to the Braintree UPS Store.  This is one example of a pattern in the email campaign that demonstrates the coordination between MC Govt, and the Massachusetts UPS Store emals.

## VI:  <u>Claim 1:  Defendant UPS; 18 USC 1595 Private Action for Trafficking violations</u>

    20.    Plaintiff hereby re-alleges and incorporates paragraphs 1 through 19 as though fully set forth herein.

1

    21.    Big Wigs as the emails taunt, the incredible expense involved, the business acumen seen, the intertwining with government officials and agencies, the nature and cost of dominatrix based role play; all point to conduct headed by executive level individuals, such as those at the top of UPS.  Defendants have created a monster; in the form of a Stanford Prison Study of sorts.  A monster that gives them sexual gratification, and one they're unwilling to reign in.

    22.    18 USC 1595 has a 10 year Statute of Limitations.  February 15, 2013 does fall beyond the period, however; The Complaint does allege a single continuous event, encompassing more than 10 years, and including, today.  In reading 18 USC 1591 Subsection A; an active scheme, working towards sexual contact in the future, is a violation.  The actions of the Venture within the 10 year period, viewed separate from events of February 15, 2013; are violations.  Defendants and the Venture see it in these ways.  They called this conduct "Obsessionhedge".  Conspiracy, and Attempt violations, along with the role play work of a "Submissive" thrust upon Plaintiff; all occurred continuously during the entire period.

    23.    Tolling issues present: Applying the Discovery Rule; the sexual nature, the

19

Massachusetts unknown defendants, and UPS involvement; wasn't known until about 2017. Plaintiff has computer data to show that Plaintiff began typing the Complaint, in November, 2021. It is owed to the bodily injuries Defendants caused by force, followed by Defendants continuous force, including blocking Plaintiff's medical care; that Plaintiff took so long to complete typing the Complaint. Defendants and the Venture, as part of their obsession hedge, engaged in unlawful acts, calculated to prevent Plaintiff from filing suit.

24. Defendants, and the Venture view Plaintiff, as being conscripted to work for their goals. The mindset goes back to what was very likely reported to the Virginia medical regulators; the false allegation that Plaintiff is a willing participant.

25. In United States v. Glenn Marcus, it was a case of an, one on one consensual BDSM relationship that was found to have crossed into non-consensual mistreatment. A Civil case against Hollywood producer Harvey Weinstein, Kadian Noble v. Harvey Weinstein, "**While** the instant case is **not an archetypal sex trafficking action**, the **allegations plausibly establish that** Harvey's 2014 **conduct** in Cannes, France **violated Section 1591**". The plaintiff in that case was Jamaican and British, and residing in U.K. The violations occurred in France. Weinstein is a Hollywood producer. The case was filed in one of the New York federal court districts.

26. The alleged facts by the plaintiff in Lisa Ricchio v. Clark McLean etal, was that she was held against her will in a motel room by McLean The **3rd Circuit** Appellate **ruling** authored by retired Supreme Court Justice Souter, ruled that **medical, physiological means** of drugging and of limiting food; **are within the definition of "force"**. Additionally, that motel owners who had knowledge but persisted in renting to Mr. McLean; violated 18 USC 1595. In USA v. Raniere, this is the sex cult case in the news, that involved some celebrities; the court found that coercing a low calorie diet causes symptoms as dizziness and fatigue; thus is force. In Jane Doe v. Mamoun Darbagh, M.D. (2:15-cv-10724-SJM-EAS) the court found that a physician who provided drugs that altered physical and mental states violates 18USC 1595.

27. Reading **18 USC 1591, The TVPRA has the term Trafficking in the title. The word doesn't appear anywhere else. There lies the explanation for why something other than what one envisions to be Trafficking, violates this Law.** Scholarly articles use terms "elastic meanings of trafficking". It's the Elements of this Law which Plaintiff is responsible to prove: **a venture that obtained or is working obtaining sex, affected Interstate Commerce, money or something of value was involved, force or coercion was involved.**

28. UPS describes itself as a logistics business. The UPS Stores unit provides small

business solutions. All activity by UPS, inherently, affects Interstate Commerce. The conduct directed at Plaintiff involves internet domains, servers, Yahoo mail. Medical care, and self pay service in particular, which traversed Maryland, Virginia, and DC; affects Interstate Commerce.

29. U.S. Postal Service has long been in the business of post office boxes. The price in the Boston Area is $175 annually. Defendant UPS charges $400. UPS has a substantial vetting process for new mailbox customers, whereas USPS has none at all. The annual price of owing an internet domain address is $20-40, with additional cost if already owned by someone. Domain registrations require a mailing address. A single free address like a home address, or the $175 annual fee Postal Service post office box; would have been sufficient for registering an unlimited number of domain addresses.

30. The purchase of UPS mailboxes was entirely unnecessary; outside of UPS

executives wanting to "out" themselves to Plaintiff. In a similar analysis, the rationale for Boston Area over Plaintiff's Area, or rental in lower cost of living areas; was a signature that this was also the work of individuals in the Boston Area. All this occurring within the construct of the dominatrix and submissive dynamic. The executive level men want to be, and thus are, bossed around; by the absolute nobody, young women. This; to the level of damaging the organization, corporation, or government, they head.

31.     Coinciding with Plaintiff's success in the Summer of 2014; multiple mail box addresses were rented at more than 10 UPS Stores in the Boston Area. Cambridge appears to be the lead on all fronts. Both Cambridge locations are involved, along with the neighboring Watertown location, and P.O. box from the Cambridge Post Office. Additionally, in variance to other addresses, including those in states as Pennsylvania; there was more than 1 mailbox address rental at these 3 locations. A nonexhaustive list of other cities, include; Boston, Bedford, Everett,

Medford, Stoneham, Wakefield, Beverly, Concord, Braintree, and Mansfield.

32.     The business names in the early years, were all job search themed titles as Employment Emperor, Jobs Alamo, and Wage Wonder. These, and others, including **some registered with a Massachusetts business license**, were fake businesses. They didn't provide any job related service. "Job search" provided an inherent taunt; that the venture blocked Plaintiff's employment opportunities, both by using bodily injuries, and by conspiring with employers to scuttle hiring. This, in addition to the taunt that the Venture is providing fulltime employment to Plaintiff, albeit without compensation, and by force, doing role play work.

33.     The emails' body seldom related to job searches. Sometimes, job listings were emailed from these fake employment entities. These were always jobs in Wisconsin, copied from legitimate job search companies. This sends the message that many from the female cohort are in Wisconsin. That these women have been added to the payroll of Maryland and Washington, DC Medicaid. The contractor Medstar, in 2013, moved it's Maryland based office jobs, to Wisconsin. That these women being paid by Medicaid funds for low-income individuals in Maryland, and Washington, DC; are some of the ones doing the work of the email campaign.

34.     The pattern of the UPS Stores, utilized; extends north and west from Boston, with a concentration in close-in areas. The 2 breaks in the pattern, is going far south to involve Braintree, and Mansfield. Two words present in "Braintree" are "brain", and "tree". The primary method of force; is injury to the brain. One of two means used to taunt Plaintiff, and to alert him that a newsmaking calamity the venture caused, occurred; is the emails. These are most closely linked to UPS and unknown Boston individuals. The other means is the destruction of trees around Plaintiff's home. This is most closely linked to Elrich. Mansfield is likely used to spotlight Plainville resident, Michelle Carter. There is a link possibly to the individual, Marc

Elrich, made his DOT director. Chris Conklin a longtime resident of Norfolk County, who was employed in Watertown. Details, at a later section of the Complaint.

35.     Employment scams have been around a long time. There have been numerous actions against these scam artists by the Postal Inspector's Office and State Attorneys General. The rental applications should reasonably have triggered suspicion by UPS. The individual franchisees don't do their own vetting. It's done by UPS. **UPS would've flagged, and rejected these mailbox applications; had it not been UPS itself, who was behind it.**

36.     It's not an absolute immunity, but Congress with other laws gave a degree of

immunity to Internet based entities  UPS is not that type of business.  Had Plaintiff's Complaint been related to the bulk of Defendant's business, and what it is known for, that is package shipping; it would be reasonable for Defendant to claim to not have knowledge of specifics occurring in that mass production factory and trucking operation.  Plaintiff contacted UPS about the email campaign via email, and Twitter.  This UPS ignored.  Reasonably, the not knowing defense should be unavailing.  Although the Complaint isn't required to establish that the officers of UPS, it's executives, are sexually gratified by the sexual scheme directed at Plaintiff, the messages when viewed in it's totality, along with the totality of events; do show precisely that.

37.     The term Venture doesn't have to be a massive ring, with multiple victims.  A conspiracy directed at Plaintiff would fit the meaning.  This Venture engaged in a successful scheme that included; providing, and obtaining Plaintiff.  Plaintiff, not in the form of a vibrant man, but in the form of an incapacitated, diminished, vulnerable adult, for sex acts by force.  Force by the means of medical expertise and medical implements to render him unconscious.  Then followed by the force of non-consensual sex acts against an incapacitated and unconscious Plaintiff.  Followed with; making injuries already caused, into a weapon of force, to cause new

injuries.  Injuries, the Venture predicts will lead to physical and mental incapacitation and incompetence; allowing resumption of nonconsensual sexual acts against a diminished Plaintiff.

38.     The sex acts are within the meaning of a commercial sex act.  Similar to the concept of affecting Interstate Commerce, the term commercial sex act has a broad meaning.  No one need have made a direct payment like in a prostitution sale.  Anything of value to anyone, on account of this scheme, including the payment Plaintiff, himself made for the MRI test, suffices.  This Complaint shows that things of value were transacted all over the place.

39.     UPS does not have to be a principal.  The Complaint demonstrates that UPS, at a minimum, knowingly participated; allowed it's UPS mailbox stores to be misused, and financially benefited.  Plaintiff, though he was harmed on February 15, 2013; had miraculously survived with treatable and manageable bodily injuries.  **The UPS Boston Area addresses, and linked malicious email campaign was an effort to; rally and keep the perpetrators excited, entice additional perpetrators to join, with the promise that by restraining Plaintiff's medical care, and financial opportunities; they could pick up where they left off on February 15, 2013.**  This is: permanent incapacitation and turning Plaintiff into a vulnerable adult, allowing for sexual assault against a vulnerable adult.  **Additionally, while waiting to again having physical sexual contact** (in the style done on February 15, 2013) **with Plaintiff, for some, or for the first time for others ; they could be sexually aroused and gratified, at Plaintiff's expense.  Defendants and the Venture even made a term; Obsessionhedge.**


## CONCLUSION

For the foregoing reasons, this Court should reverse the District Courts

Memorandums and Orders granting a Motion to Dismiss in favor of Appellee UPS,

and a Motion to Dismiss in favor of Appellee Marc Elrich.

Respectfully Submitted,
/S/ Joseph Crussiah
Joseph R. Crussiah
Pro Se Appellant
9701 Cottrell Terrace
Silver Spring, MD 20903
301-221-8444
jcrussiah@gmail.com

## CERTIFICIATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32, I certify that this Appellant's Brief complies with the 30 page limit.  It has 23 pages.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 30th day of April, 2025 using the CM/ECF System which will send notice to all counsel on record.

/S/ Joseph Crussiah
Joseph Crussiah

# **ADDENDUM**

Memorandums and Opinion Orders....... 001-002

UPS Settlement Exhibit.....................................003

28 Judge Richard G. Stearns: ORDER entered. ORDER DISMISSING CASE. (JAM) (Entered: 02/10/2025)

02/10/2025 27 Judge Richard G. Stearns: ELECTRONIC ORDER entered granting 20 Motion to Dismiss for Failure to State a Claim; finding as moot 20 Motion for More Definite Statement. Plaintiff Joseph Crussiah initiated this litigation against United Parcel Service (UPS) and Marc Elrich, a County Executive for Montgomery County, Maryland. In his 74-page, mostly inscrutable Complaint, Crussiah alleges that UPS and Elrich participated in a "sadomasochistic sex crime venture" along with "[e]xecutive level individuals from large corporations, institutions as hospitals and universities and local, state and federal governments" which allegedly targeted Crussiah with ongoing sexual assaults, the initial one occurring on February 15, 2013, while Crussiah was "drugged." Compl. para. 3. As part of this venture, Crussiah alleges that these named defendants, along with "unknown Boston Area residents, have spent $ 2 million to purchase 3,000 or more internet domain names and linked them to a Boston Area UPS store [t]hen waged an abusive email campaign; time-wise equal to full-time employment for 20 individuals." Compl. 3. The Complaint narrates injuries ranging from an MRI Crussiah had in Bethesda, Maryland in 2015 which "caused massive internal injuries," to infamous events, natural disasters, and deaths which took place between 2014 and 2019, most without even general attribution to the "venture." UPS has moved for its dismissal, or in the alternative, a more definite statement.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."Id. Offering labels and conclusions will not suffice: a complaint must allege more than bare assertions "devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557) (additional internal quotations marks omitted).

Crussiah alleges that UPS has violated the Trafficking Victims Reauthorization Act, 18 U.S.C. § 1595 (the TVPRA). UPS is a shipping company. It is also the parent company of The UPS Store, Inc., which is, in turn, a franchisor for various The UPS Stores throughout the United States. Crussiah alleges that various franchisees of The UPS Stores in Massachusetts violated the TVPRA by leasing mailboxes to certain entities who sent him taunting communications. UPS, as parent of the franchisor, and The UPS Store, Inc., as franchisor to independent franchisees, play no role in the leasing of personal mailboxes that figure in Crussiah's Complaint. Moreover, Crussiah's Complaint fails to factually support any element of a claim under the TVPRA. Crussiah has failed to plead, no could he on the facts presented, that UPS "(1) knowingly benefitted (2) from participation in a venture (3) that [it] knew or should have known has engaged in trafficking" them. See Tyla D. v. MGM Resorts Int'l, 2024 U.S. Dist. LEXIS 210612, at *8, 24-cv-00698 (D. Nev. Nov. 19, 2024); see also Doe 1 v. Apple Inc., 96 F.4th 403, 411 (D.C. Cir. 2024).

ADDENDUM 001

Crussiah's Complaint against the remaining defendant, UPS, is DISMISSED with prejudice. The Clerk will enter an Order of Dismissal and close this case.

(mkz) (Entered: 02/10/2025)

02/08/2025 26 Judge Richard G. Stearns: ELECTRONIC ORDER entered granting 22 Motion to Dismiss. Plaintiff Joseph Crussiah initiated this litigation against United Parcel Service (UPS) and Marc Elrich, both in his individual capacity and as County Executive for Montgomery County, Maryland. In his 74-page, mostly inscrutable Complaint, Crussiah alleges that UPS and Elrich participated in a "sadomasochistic sex crime venture" along with "[e]xecutive level individuals from large corporations, institutions as hospitals and universities and local, state and federal governments" which allegedly targeted Crussiah with ongoing sexual assaults, the initial one occurring on February 15, 2013, while Crussiah was "drugged." Compl. para. 3. As part of this venture, Crussiah alleges that these named defendants, along with "unknown Boston Area residents, have spent $ 2 million to purchase 3,000 or more internet domain names and linked them to a Boston Area UPS store [t]hen waged an abusive email campaign; time-wise equal to full-time employment for 20 individuals." Compl. 3. The Complaint narrates injuries ranging from an MRI Crussiah had in Bethesda, Maryland in 2015 which "caused massive internal injuries," to infamous events, natural disasters, and deaths which took place between 2014 and 2019, most without even general attribution to the "venture."

Elrich, a resident of Maryland without the necessary personal contacts with Massachusetts, moves for dismissal rightly arguing that the court lacks jurisdiction over him. In the alternative, he argues that Crussiah's Complaint lacks the factual basis for claims upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Because the court lacks personal jurisdiction over Elrich, as his sworn affidavit makes clear, he will be dismissed from this case.

Crussiah fails to meet his burden of pleading facts or proffering evidence which "suffice to show all facts essential to personal jurisdiction." Baskin-Robbins Franchising, LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). To establish jurisdiction over the defendants, Crussiah may not rely on "unsupported allegations in his pleadings," Boit v. GarTec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992), but is "obliged to adduce evidence of specific facts." Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995). Crussiah's only factual allegations that occurred in Massachusetts are unrelated disasters and crimes and emails allegedly sent to Crussiah from Massachusetts by unknown individuals. While none of the named parties are citizens of Massachusetts, Crussiah asks the court to find jurisdiction based upon alleged unknown defendants within Massachusetts that will be identified through discovery "[d]efendants hold the key to identifying individuals in Massachusetts," Pl.'s Opp'n at 1. However, adding Massachusetts defendants does not create personal jurisdiction over Elrich, who has no ties to this state. Without jurisdiction, the court is unable to address Elrich's substantive arguments. Accordingly, Elrich's motion to dismiss is ALLOWED based upon the court's lack of personal jurisdiction. The Clerk may terminate Elrich from this case.

SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS

This settlement agreement and release of all claims ("Agreement") is between and among, on the one hand, Mr. Joseph Crussiah ("Crussiah"), and on the other hand, United Parcel Service, Inc. ("UPS Inc.") and The UPS Store, Inc. ("TUPSS") (collectively, "UPS"). Mr. Crussiah and UPS are each hereafter referred to as a "Party" and collectively as the "Parties." The Agreement will settle, among other things, all claims and allegations, made or that could have been made, arising from and relating to the legal action filed in the United States District Court for the District of Massachusetts, No. 1:24-cv-12398-RGS (the "Action") as they relate to UPS and TUPSS.

1. Consideration. In exchange for the dismissal, with prejudice of UPS from the Action, UPS will provide to Crussiah the identity and contact information of the six The UPS Store franchisees agreed to by the parties (the "Settlement Information").

2. Delivery of the Settlement Information. Within two business days following the transmittal of the executed Settlement Agreement, counsel for UPS will provide the Settlement Information by email to jcrussiah@gmail.com.

3. Dismissal. Within two business days of receipt of the Settlement Information, Mr. Crussiah shall execute and mail for filing (or file through the Court's online docket) the agreed to Rule 41 Stipulation of Dismissal, With Prejudice, attached hereto as Exhibit A. Mr. Crussiah shall serve the dismissal on counsel for counsel for UPS at George.Farrell@gtlaw.com.

4. Releases. Other than the terms and obligations set forth in this Agreement, Mr. Crussiah and his agents, representatives, heirs, relatives, successors, predecessors, assigns, and partners (collectively, "Releasing Parties") hereby completely release, discharge and covenant not to sue UPS, all UPS affiliates and related parties, and each of their respective franchisees, employees, former employees, agents, representatives, shareholders, parent companies, related companies, subsidiaries, attorneys, officers, and directors (collectively, "Released Parties"), as to any and all known and unknown claims, causes of action, damages, disputes, and obligations (collectively, "Claims"), whether based in contract, equity, statute, negligence, or any other theory of law, that were, or could have been, asserted in, that arise out of, or that relate to, the Action.

Mr. Crussiah agrees not to maintain the Action against UPS and not to introduce any evidence at the trial of the Action related to UPS.

Nothing herein shall preclude UPS from seeking indemnification from anyone, including any franchisee or insurer, of the attorneys' fees or any other costs expended in connection with this matter.

Waiver of C.C. 1542. California Civil Code Section 1542 provides as follows:
A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.